# Slip Op. 01-116

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ALTX, INC., AMERICAN EXTRUDED PRODUCTS, CORP., DMV STAINLESS USA, INC., SALEM TUBE, INC., SANDVIK STEEL CO., PENNSYLVANIA EXTRUDED TUBE COMPANY, and UNITED STEEL WORKERS OF AMERICA, AFL-CIO/CLC, | : : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | |
| THE UNITED STATES, and THE UNITED STATES INTERNATIONAL TRADE COMMISSION, | : : : : | |
| Defendants, | : : : | Court No. 00-09-00477 |
| and | : : | **Public Version** |
| SUMITOMO METAL INDUSTRIES, NIPPON STEEL CORPORATION, KAWASAKI STEEL CORPORATION, NKK CORPORATION, KOBE STEEL LTD., and SANYO SPECIAL STEEL COMPANY, | : : : : : : : : : | |
| Defendant-Intervenors. | : : | |

[ITC material injury determination remanded.]

Dated:  September 19, 2001

Collier Shannon Scott, PLLC (David A. Hartquist, Jeffrey S. Beckington, and R. Alan Luberda) for plaintiffs.

Lyn M. Schlitt, General Counsel, Marc A. Bernstein, Assistant General Counsel, United States International Trade Commission (Rhonda M. Hughes), for defendants.

Wilmer, Cutler & Pickering (John D. Greenwald, Leonard Shambon, and Lynn M. Fischer) for defendant-intervenors.

## OPINION

**RESTANI, Judge:**  Plaintiffs Altx, Inc., American Extruded Products Corp., DMV Stainless USA, Inc., Salem Tube, Inc., Sandvik Steel Co., Pennsylvania Extruded Tube Company, and United Steelworkers of America, AFL-CIO/CLC (collectively "Altx") appear before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2, challenging the final negative injury and threat determinations of the United States International Trade Commission ("ITC" or "Commission") in Circular Seamless Stainless Steel Hollow Products from Japan, Inv. No. 731-TA-859 (Final), USITC Pub. 3344 (Aug. 2000).[1]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

---

[1]      Of the six commissioners who participated in the decision, four found no material injury by reason of dumped imports.  Chairman Koplan and Vice Chairman Okun dissented.  See Circular Seamless Stainless Steel Hollow Products from Japan, USITC Pub. 3344, at 1 n.2.

The ITC's material injury analysis requires an evaluation of (1) the volume of subject imports, (2) the effect of such imports on prices for the domestic like product in the United States, and (3) the impact of such imports on U.S. producers of the domestic like product. 19 U.S.C. § 1677(7)(B)(i). Only after the consideration and explanation of all three factors may the Commission arrive at a final determination. See Angus Chem. Co. v. United States, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998).

## I. Volume

The statute directs the Commission to "consider whether the volume of imports of the [subject] merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). The ITC concluded that subject import volume was not "significant" during the period of investigation ("POI"), "notwithstanding the increases in subject import volume and market penetration from 1997 to 1998." Circular Seamless Stainless Steel Hollow Products from Japan: Views of the Commission (Sept. 5, 2000), ITC App., C.R. Doc. 212, at 17 [hereinafter "Final Determination"]. The Commission identified the following four observations in support of its volume conclusion: (1) Subject import volumes actually declined during the period when the domestic industry performed poorly; (2) The "consistent" and "substantial" drop of subject import volume was not, as plaintiffs argue, in reaction to the filing of the petition; (3) Nonsubject imports may have played a significant role in the market, displacing domestic like products; and (4) Competition between subject imports and the domestic like product was somewhat attenuated. Id. at 15-17.

**A. Correlation between import volumes and performance of the domestic industry**

Although it acknowledged that subject import volumes almost doubled between 1997 and 1998, the Commission found that subject import volumes "then declined consistently and substantially thereafter."[2] Id. at 16-17. Also noted in the Final Determination are declines in both subject import market share and value between 1998 and 1999. Id. at 15. Emphasizing these downward indicators in the latter part of the POI, the Commission concluded that there could be no correlation between subject imports and the condition of the domestic industry, which actually weakened when subject import volumes declined in 1999. Id. at 17.

Plaintiffs contest this conclusion regarding correlation with the state of the domestic industry. First, although the domestic industry performed favorably during the first part of the POI, at a time when subject import volumes increased significantly, Plaintiffs insist that the domestic industry's performance was directly attributable to [                              ] by domestic producers. Pl.'s Reply Br., at 2-3. Controlling for [            ], Plaintiffs argue, reveals a weakening domestic industry between 1997 and 1998.[3] Second, Plaintiffs acknowledge that in 1999, the domestic industry, including exports, experienced a marked decline. Plaintiffs argue, however, that in a market with shrinking consumption, merchandise is consumed more slowly as stocks last longer. Consequently, increased purchases of subject import merchandise in 1997 and 1998 may have been consumed into the next year, thus harming the domestic industry

---

[2]      The quantity of subject import volume rose from [            ] short tons in 1997 to [        ] short tons in 1998; the following year, volume fell to [            ] short tons. Final Determination, at 15 n.68.

[3]      Plantiffs cite [                                        ] in support of their characterization of the domestic industry.

only in 1999, as the data demonstrates.  Pl.'s Reply Br., at 5 n.1.[4]  Finally, Plaintiffs point to the

Commission's own econometric analysis, in which the ITC staff concluded that subject imports

result in a 7.2% to 16.1% reduction in output in the domestic industry.  Staff Report (Aug. 3,

2000), ITC App., C.R. Doc. 208, at F-3, cited in Pl.'s Initial Br., at 23-24.

In the Final Determination, the ITC does not explain how the decline of subject imports

between 1998 and 1999 is dispositive of the significance of subject import volumes in light of

Plaintiffs' arguments combined with its own econometric analysis.  The statute directs the

Commission to

> include in a final determination of injury an explanation of the basis for its
> determination that addresses relevant arguments that are made by interested
> parties who are parties to the investigation or review (as the case may be)
> concerning volume, price effects, and impact on the industry of imports of the
> subject merchandise.

19 U.S.C. § 1677f(i)(3)(B) (emphasis added).   Thorough consideration of such arguments and

analyses is also an integral element of the Commission's responsibility to "examine the relevant

data and articulate a satisfactory explanation for its action . . . ."  Motor Vehicle Mfrs. Ass'n v.

State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Cf. United States v. Nova Scotia Food

Prods., 568 F.2d 240, 252 (2d Cir. 1977) ("It is not in keeping with the rational [agency] process

to leave vital questions, raised by comments which are of cogent materiality, completely

unanswered.").  The Final Determination merely cites to record evidence containing data on

---

[4]     The ITC has not filed confidential versions of the petitioners' submissions below.
Because defendant did not claim failure to exhaust remedies, the court assumes that these
specific arguments are contained in the confidential filings.  Because the important arguments as
to the econometric analysis are clearly raised, see Petitioners' Final Comments (Aug. 15, 2000),
at 13, P.R. Doc. 94, the court would require remand in any case.

subject import indicators throughout the POI.[5]  This off-handed reference to annual data cannot,

by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned

explanation for discounting them, as the statute requires.[6]  See Bethlehem Steel Corp. v. United

States, 140 F. Supp. 2d 1354, 1364 (Ct. Int'l Trade 2001).  Furthermore, whatever discretion the

Commission may have to reject deliberately the conclusions found in the agency's Staff Report,

Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1058-59 (1995), it may not through

its silence simply ignore a Staff Report analysis that contradicts the Commission's own

---

[5]     In its brief, the ITC concedes that the subject import volumes were indeed higher in 1999 than 1997 levels, but nevertheless advances various arguments in support of the conclusions in the Final Determination.  The brief fails, however, to refer to any section of the Final Determination where one finds a similar explanation.  See ITC Br., at 12-13.  The court restricts its review to matters found in the Final Determination and therefore does not consider such post hoc rationales for an agency's decision.  See Ta Chen Stainless Steel Pipe, Ltd. v. United States, No. 99-07-00446, Slip Op. 01-101, at 9-10 (Ct. Int'l Trade Aug. 14, 2001).

[6]     The statutory requirement that the agency properly respond in the Final Determination to all relevant arguments raised by interested parties is especially clear when one compares 19 U.S.C. § 1677f(i)(3)(B) (1994) with the statute existing before the Uruguay Round Agreements Act ("URAA"), which provided only that the ITC

> shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based . . . .

19 U.S.C. § 1673d(d) (1988).  The former statute did "not require that an agency make an explicit response to every argument made by a party, but instead require[d] that issues material to the agency's determination be discussed so that the 'path of the agency may reasonably be discerned' by a reviewing court."  Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 892, reprinted in 1994 U.S.C.C.A.N. 4040, 4215 ("SAA") (citation omitted). See also Jeanette Sheet Glass Corp. v. United States, 9 CIT 154, 161, 607 F. Supp. 123, 130 (1985) (quoting H.R. Doc. No. 96-153, at 27 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 665, 685).  In contrast, the URAA includes in addition to the above-quoted language 19 U.S.C. § 1677f(i), under which "the agencies must specifically reference in their determinations factors and arguments that are material and relevant, or must provide a discussion or explanation in the determination that renders evident the agency's treatment of a factor or argument."  SAA, at 892, reprinted in 1994 U.S.C.C.A.N. at 4216 (emphasis added).

conclusions where an interested party has specifically brought the possibly conflicting evidence

to the agency's attention.[7]  Therefore, the court cannot, without more, sustain the Commission's

conclusions regarding the correlation between subject import volumes and the health of the

domestic industry, as the Final Determination lacks needed explanation.


### B.  Declining volumes as a response to the filing of the antidumping petition

If the Commission finds that a change in the volume, price effects, or impact of subject

imports since the filing of the petition is related to the pendency of the investigation, it may

reduce the weight accorded to the relevant data.  19 U.S.C. § 1677(7)(I).  Plaintiffs assert that

rumors of an imminent antidumping petition, circulating in early 1999, could have affected

purchasing and production of subject merchandise.  In response, the Commission stipulated that

"[e]ven if respondents were aware a few months into 1999, we do not find it credible that the

drop in imports in the first half of 1999 can be attributed to such knowledge . . . ."  Final

Determination, at 16 n.75.  The Commission reasoned that because of the 13-26 week lag period

between the purchaser's placement of the order and the arrival of the imports, any drop in

volume measured during the asserted period of awareness, must have been initiated by a drop in

---

[7]      USEC, Inc. v. United States, 132 F. Supp. 2d 1 (Ct. Int'l Trade 2001), is not to the
contrary.  First, the economic model that the ITC allegedly failed to consider in that case had
been developed not by ITC staff, but by the Department of Energy to make predictions about the
U.S. uranium market.  See id. at 7 n.9.  The ITC naturally has greater flexibility in choosing not
to follow analyses conducted under the auspices of another agency, particularly one that is not an
independent agency, such as executive departments.  Cf. Humphrey's Executor v. United States,
295 U.S. 602, 628-29 (1935) (emphasizing distinction between independent agency and
executive departments).  Second, as the USEC court explained, the economic model at issue was
not "material" to the ITC's analysis because the model examined only a limited segment of the
product market at issue, whereas the ITC had reasonably concluded that the product market
should not be evaluated in segments.  See USEC, 132 F. Supp. 2d at 16.

orders placed 13-26 weeks earlier, long before rumors may have existed. Accordingly, the

Commission concluded that any pre-filing awareness of the petition did not affect the volume of

subject imports.

The Commission does not support its reasoning with substantial evidence.[8] The

Commission relied solely on record evidence suggesting that Japanese importers tend to require

13-26 weeks from the time of order to arrival. See Staff Report, at II-29. Altx urges the use of

another time period, between the time of export to delivery, which can be less than two weeks,

because an order may be canceled at anytime until the hollow product is exported, thereby

lowering the volume of subject imports. In support of its claim, Altx points to record evidence

that a purchaser of imported hollow products "dropped Japanese mills because of dumping suit

filed."[9] Purchasers' Questionnaire Response (July 14, 2000), at 9, C.R. Doc. 361, Pl.'s App.,

Tab 5, at 2. If the Plaintiffs' far-shorter time-span is employed instead of the Commission's, the

decline in subject import volume in the first half of 1999 may indeed have been in response to

the imminent filing of the petition. The potential two-week period precludes the ITC from

concluding that, as a matter of logical deduction only, reduced volumes of subject imports could

not have resulted from rumors of an antidumping investigation, as the ITC apparently concluded

in the Final Determination.

---

[8]    Altx did possess the burden of producing evidence to support its assertion of rumors of an imminent petition. Yet, as the Commission's argument assumed the existence of industry knowledge of the impending antidumping investigation, the court reviews whether the ITC's conclusions were supported by substantial evidence without regard to the validity of Plaintiffs' claims of rumors.

[9]    The court takes no position on the probative value of this evidence as support for Plaintiffs' position. It is up to the ITC to weigh evidence. See Mukand Ltd. v. United States, 20 CIT 903, 906-07, 937 F. Supp. 910, 914-15 (1996).

The Final Determination does not offer a reasonable explanation for why the

Commission's time period is the operative one as opposed to Plaintiffs' two-week period. "In

order to ascertain whether action is arbitrary, or otherwise not in accordance with law, reasons for

the choices made among various potentially acceptable alternatives usually need to be

explained." Bando Chem. Indus., Ltd. v. United States, 16 CIT 133, 136, 787 F. Supp. 224, 227

(quoting Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177,

704 F. Supp. 1068, 1071 (1988)), aff'd, 26 F.3d 139, 1994 WL 163953 (Fed. Cir. 1994). Absent

such explanation, the Commission's conclusion rests on a mere theoretical possibility that the

decline in volume was more likely attributable to a decline in orders placed in mid-to-late 1998,

unrelated to unfair trade proceeding activities. Such speculation cannot constitute substantial

evidence. Pohang Iron & Steel Co. v. United States, No. 98-04-00906, 1999 WL 970743, at *11

(Ct. Int'l Trade Oct. 20, 1999); China Nat'l Arts & Crafts Import & Export Corp. v. United

States, 15 CIT 417, 421-22, 771 F. Supp. 407, 411-12 (1991).[10]


**C. Displacement of the domestic like product by nonsubject imports**

The statute provides that the Commission shall analyze the significance of subject import

volumes "in absolute terms or relative to production or consumption in the United States . . . ."

19 U.S.C. § 1677(7)(C)(i). As nonsubject imports constitute a share of the merchandise

---

[10]      The court of course recognizes that the ITC's decision to discount data otherwise affected by the filing of the antidumping petition is discretionary, see 19 U.S.C. § 1677(7)(I), and that the ITC, therefore, is not required to discount the relevant data even if the agency finds a change in data to be related to the pendency of the investigation. Nevertheless, the Commission may abuse its discretion where, as here, the agency employs an irrational basis for its conclusion. See Bando, 787 F. Supp. at 226-27.

consumed domestically, the ITC properly examined their role in the U.S. market.  In the Final

Determination, the Commission states:

> Nonsubject market share was greater than subject market share for most of the
> period.  Indeed, from 1998 to 1999, the declining presence of subject imports in
> the U.S. market was more than made up for by increasing nonsubject import
> volumes even as apparent U.S. consumption declined.

Final Determination, at 15-16 (footnotes omimtted). The inference to be drawn, apparently, is

that nonsubject imports were a significant competitive presence in the market, displacing both

subject imports and domestic like products.

Relying on Gerald Metals, Inc. v. United States, 132 F.3d 716, 720-22 (1997), Plaintiffs

initially argue, incorrectly, that the Commission bears a burden to show a causal link between

nonsubject imports and the state of the domestic industry.  Plaintiffs are undoubtedly correct that

Gerald Metals placed on the Commission the burden of showing a "causal -- not merely temporal

-- connection between the LTFV goods and the material injury."  Pl.'s Initial Br., at 13 (quoting

Gerald Metals, 132 F.3d at 720).  The Commission's duty to establish such a causal link

followed necessarily and exclusively from the statute's mandate that material injury to the

domestic industry be "by reason of" dumped imports.  Gerald Metals, 132 F.3d at 719-23.  See

also Gerald Metals, Inc. v. United States, 27 F. Supp. 2d 1351, 1354 (Ct. Int'l Trade 1998)

(discussing Federal Circuit's decision in Gerald Metals).  There is no statutory requirement that

the Commission similarly show a causal link between nonsubject imports (i.e., imports that have

not been identified as being sold at less than fair value) and material injury.  Rather, the ITC is

permitted to conclude that other factors, whether they themselves may be said to "cause" injury,

certainly undermine the notion that dumped imports are a cause of injury.  In this case, a positive

correlation concerning <u>nonsubject</u> import volumes, in conjunction with other factors, may be

sufficient to cut the causal link between subject imports and any harm suffered by the domestic

industry.

Nevertheless, the Commission has failed to support rationally its conclusion regarding the

significance of nonsubject import volumes.  The Final Determination refers only to 1998-99

figures, which indicate that in a period of declining consumption, nonsubject imports increased

considerably in market share, while the market share for domestic like product rose slightly and

subject imports decreased appreciably.  <u>See</u> <u>Final Determination</u>, at 16 & n.72 (citing <u>Staff</u>

<u>Report</u>, at Table IV-5).[11]  Moreover, the Commission noted that "some purchasers perceive

nonsubject hollow products to be a generally more competitive alternative to Japanese products

than the domestic products."  <u>Id.</u> at 16 n.72.  This evidence suggests at the very least

circumstantial proof of displacement of both subject imports and the domestic like product by

nonsubject imports.

While the data cited by the ITC may give rise to a reasonable inference that nonsubject

imports detracted from the significance of subject import volumes, a rational application of the

Commission's rationale to the *entire* POI, however, reveals contrary conclusions.  In particular,

the Commission's reasoning as regards nonsubject imports between 1998 and 1999 raises

potentially significant unsettled questions when applied to the 1997-98 period, at the beginning

of the POI.  Between 1997 and 1998, in a time of rising consumption, market share for the

---

[11]      Table IV-5 of the Staff Report reveals the following shifts in market share from 1998 to 1999, respectively:  nonsubject imports – [          ]% to [          ]%; subject imports – [          ]% to [          ]%; and domestic like product – [          ]% to [          ]%.  U.S. consumption in the same period fell from [          ] short tons to [          ] short tons, a decline of [          ]%.

domestic like product and nonsubject imports fell while subject import market share rose markedly.[12] Following the Commission's reasoning, this record evidence suggests, at least circumstantially, that the increased consumption in the first part of the POI was captured primarily by subject imports. Therefore, in contrast to the conclusion for the 1998-98 time period, the ITC's rationale would indicate that subject imports displaced both nonsubject and domestic like products between 1997 and 1998.

The Commission may of course permissibly focus its analysis on a specific time frame within the POI. See Taiwan Semiconductor Indus. Ass'n v. United States, 105 F. Supp. 2d 1363, 1373 n.13 (Ct. Int'l Trade 2000) ("Taiwan Semiconductor II"); Angus Chem. Co. v. United States, 20 CIT 1255, 1258-59, 944 F. Supp. 943, 947-48 (1996), aff'd, 140 F.3d 1478 (Fed. Cir. 1998). It is likewise axiomatic that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Grupo Industrial Camesa v. United States, 85 F.3d 1577, 1582 (Fed. Cir. 1996) (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). Nevertheless, the Commission "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Pohang, 1999 WL 970743, at *11 (quoting Allentown Mack Sales & Serv. v. NLRB, 522 U.S. 359, 378 (1998) (emphasis added)). Having employed a rationale to interpret data from the later part of the POI in such a manner as to support its conclusion, the Commission may not ignore the fact that the

---

[12]     Table IV-5 of the Staff Report reveals the following shifts in market share from 1997 to 1998, respectively: nonsubject imports – [        ]% to [        ]%; subject imports – [        ]% to [        ]%; and domestic like product – [        ]% to [        ]%. U.S. consumption in the same period rose from [        ] short tons to [        ] short tons, an increase of over [      ]%.

same rationale applied to data from the earlier part of the POI weakens its conclusion with regard

to nonsubject imports. Further explanation is required on remand for the agency to support its

reasoning that nonsubject imports were so significant as to have displaced subject imports and

the domestic like product.[13]


### D.  Attenuated competition

The Commission observed a range of subject imports for which no domestic like product

existed. In light of this lack of competition, the ITC found in its Final Determination that "any

increased competition from rising subject import volumes between 1997 and 1998 was at least

somewhat attenuated . . . ." Final Determination, at 16. Both parties seem to agree on the

relevant underlying data, but draw diametrically opposed conclusions therefrom. Plaintiffs point

to what they characterize as "overwhelming" competition between subject imports and the

domestic like product based on the significant percentage of the product market in which

domestic and Japanese producers compete directly with one another. Pl.'s Initial Br., at 22-23.

The Commission relies on the inverse of the same data and emphasizes the relative absence of

the domestic industry from a sizeable portion of the market.[14] ITC Br., at 16-17.

---

[13]       In this regard, Plaintiffs claim that the ITC relies on evidence, contained in Table IV-5 of the Staff Report, which supports a contrary position. Specifically, Plaintiffs compare the level to which subject imports fell between 1998 and 1999 and the level to which nonsubject imports rose during the same period. Plaintiffs would have this court construe the spread between these two figures as a fatal flaw in the Commission's arguments. The court is not persuaded. Demonstration of a possible correlation between nonsubject imports and the subject market need not always rely on a one-to-one match in order to undermine sufficiently the possibility of a causal link between dumped imports and material injury.

[14]       Table I-2 of the Staff Report provides the underlying data regarding competition between subject imports and the domestic like product  The Table reveals that for the years 1997-

Two pieces of significant evidence referred to in the Final Determination support the finding of attenuated competition. First, between 1997 and 1999, the percentage range of subject imports for which there was no competition from the domestic industry increased over 50%, showing the domestic industry becoming significantly less competitive with subject imports over the POI. See supra note 14. Questionnaire responses indicating that domestic sources were unable to satisfy purchasers' requirements further corroborate this trend. See, e.g., Staff Report, at II-26 to II-27. Second, the bankruptcy of a significant domestic manufacturer may have amplified this trend. In 1997, ALTech Specialty Steel Corp. ("ALTech"), a domestic producer, went bankrupt and then ceased production of hollow products.[15] Staff Report, at Table III-1 n.1; Hearing Transcript (July 12, 2000), ITC App., P.R. Doc. 72, at 156 (testimony of Mr. Curran). To compensate, purchasers, including one that had relied on ALTech for 75 percent of its annual requirement of a certain product, were forced to seek alternative suppliers, including Japanese producers. See Hearing Transcript, at 156 (testimony of Mr. Curran). Thus, between 1997 and 1998, this singular event further reduced the domestic industry's competitiveness with subject imports. The court finds that the above evidence substantiates the Commission's finding of attenuated competition.

---

1999, respectively, the domestic industry produced no goods to compete with subject imports in [        ]%, [        ]%, and [        ]% of the market. Staff Report, at Table I-2. From the perspective of Plaintiffs, these figures suggest that the domestic like product competed with subject imports in [        ]%, [        ]%, and [        ]% of the market from 1997 to 1999, respectively.

[15]        ALTech's assets and manufacturing facility were bought by another entity, and operations resumed as ALTX, Inc., one of the plaintiffs in the present action. Staff Report, at Table III-1 n.1.

In summary, of the four reasons offered by the Commission for its negative determination as regards the significance of subject import volumes, the court finds that only one is supported by substantial evidence, namely attenuated competition between subject imports and the domestic like product.[16]  While the affirmed finding of attenuated competition is important, the court is unwilling at this point to uphold the Commission's conclusion regarding the significance of subject import volumes as based on substantial evidence in light of the lack of explanations as to potentially meaningful conflicting evidence.  The court therefore remands to the Commission for further consideration and clarification of the issues concerning the correlation between subject import volumes and the condition of the domestic industry, including the significance of nonsubject imports and whether awareness of an imminent petition affected the drop in subject import volume in the first half of 1999.

## II.  Price Effects

In evaluating the price effects of subject imports, the ITC is required to determine whether

---

[16]     Plaintiffs advance two other ultimately failing arguments, namely that the ITC's rationale makes two unfounded assumptions:  (1) that subject imports must be increasing in the most recent period to be significant, and (2) that declining subject imports cannot contribute to worsening material injury to the domestic industry.  These two claims essentially accuse the Commission of relying solely on one factor in arriving at its volume conclusion, specifically, the decline of subject import volume between 1998 and 1999.  Although this decline seems indeed an important consideration, the Final Determination clearly takes into account several other factors as well, such as nonsubject import volumes and attenuated competition.  See supra Parts I.C. & I.D.  As the Final Determination considers the decline of subject import volume in light of these other factors, the ITC does not make the unfounded assumptions of which Plaintiff complains, and these two arguments are without merit.

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  The Commission determined that underselling was not significant and that subject imports caused neither price depression nor price suppression.  See Final Determination, at 17-19.

### A.  Significance of Underselling

Citing the Commission's findings on the percentage of price comparisons that reveal underselling by subject imports, Plaintiffs initially argue that the agency's conclusion with regard to underselling is inconsistent with past ITC rulings in which significant underselling was established by underselling in 40-50 percent of the price comparisons,[17] significantly fewer than the percentage in this case.[18]  Plaintiffs effectively request this court to find as a matter of law that underselling was significant.   The Commission, however, is not compelled to find a certain percentage of underselling to be significant in one investigation merely because it has done so in previous cases.  See Czestochowa v. United States, 19 CIT 758, 783, 890 F. Supp. 1053, 1073

---

[17]      See, e.g., Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa and Taiwan, Invs. Nos. 701-TA-376, 377, and 379, and 731-TA-788 to 793 (Final), USITC Pub. 3188, at 18, V-28 (May 1999); Stainless Steel Bar from Brazil, India, Japan and Spain, Invs. Nos. 731-TA-678, 679, 681, and 682 (Final), USITC Pub. 2856, at I-17 to I-18 (Feb. 1995).

[18]      Plaintiffs cite record evidence claiming that subject imports undersold the domestic like product in [          ]% of reported purchaser price comparisons and [          ]% of reported supplier price comparisons.  See Pl.'s Initial Br., at 25 (citing Staff Report, at Tables V-2 to V-10).

(1995). The significance of underselling in an investigation will necessarily depend on the particulars of the product and industry at issue, not necessarily on the import of certain percentages understood in the abstract. To bind the Commission by such previous determinations on inherently fact-specific criteria would contradict the specific congressional mandate that "[t]he significance of the various factors affecting an industry will depend upon the facts of each particular case." S. Rep. No. 96-249, at 88 (1979). See also Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087-88 (1988) ("[T]he Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation.").

The Commission found that underselling was not significant under the first prong of 19 U.S.C. § 1677(7)(C)(ii) because there was a lack of correlation between (1) underselling and price trends, and (2) underselling and the condition of the domestic industry. The first basis relied upon by the Commission cannot substantiate its finding of no significance with regard to underselling. Section 1677(7)(C)(ii) requires the Commission to undertake two distinct analyses to examine (1) the significance of underselling and (2) the causal connection between subject imports and price depression and/or suppression. The ITC may not simply refer to its conclusion regarding the effect of underselling on price depression and/or suppression as a basis for finding underselling not to be significant; such bootstrapping collapses the two statutorily-mandated discrete inquiries and is therefore contrary to the plain language of the statute.

The Commission is on firmer ground, however, when relying on the lack of correlation between underselling and the condition of the domestic industry. Evidence of consistent underselling that occurs while the domestic industry is performing favorably may reasonably

undercut the significance attributed to underselling.  See, e.g., Coalition for the Pres. of Am.

Brake Drum & Rotor Aftermarket Mfrs. v. United States, 15 F. Supp. 2d 918, 925 (Ct. Int'l

Trade 1998).  Nevertheless, because the ITC failed to respond to apparently important arguments

regarding what Plaintiffs characterize as the Commission's misunderstanding of the condition of

the domestic industry, see supra Part I.A., the agency may arrive at a different perception of the

health of the domestic industry.  Therefore, the ITC must reconsider on remand whether a lack of

correlation between underselling and the condition of the domestic industry remains after

evaluating Plaintiffs' arguments, and if so, whether that factor is sufficient for the Commission to

conclude that underselling is not significant.

.

### B.  Effect of Underselling on Price Depression and/or Suppression

With respect to the second prong of 19 U.S.C. § 1677(7)(C)(ii), the Commission found

that underselling by subject imports caused neither price depression nor price suppression.  The

ITC identified four bases for its conclusion:  (1) although prices for the domestic like product

declined over the POI, underselling at times occurred during periods when domestic prices were

stable or rising; (2) price declines in certain periods reflected decreased raw material costs; (3)

price declines in other periods reflected a softening of demand; and (4) the influence of

nonsubject import volumes.  See Final Determination, at 17-18.

As an initial matter regarding the impact of subject imports on price depression and/or

suppression, the ITC again ignored Plaintiffs' reference to specific portions of the Staff Report

that supported Plaintiffs' position and that were flatly inconsistent with the ITC's price effects

conclusion.  Particularly, Plaintiffs cite the findings of the ITC econometric analysis that dumped

imports resulted in a "3.0 percent to 11.0 percent reduction in price" for domestic goods.  Staff

Report, at F-3.  The agency must explain on remand why it believes such a finding to be

inaccurate, inapplicable, or otherwise not relevant as the ITC formulates its own independent

conclusions.

Regarding the correlation between underselling and stable or rising domestic prices,[19]

Plaintiffs argue that stable prices during portions of 1998 are not necessarily indicative of the

absence of price suppression because domestic prices may have risen higher than indicated but

for the presence of underselling imports.  They further assert that, in the face of significantly

rising demand and declining unit cost of goods, the domestic industry should have performed

more favorably than its modest showing in 1997-1998.  Plaintiffs, however, have provided no

evidence to substantiate the assertion that the domestic industry could have enjoyed larger profits

absent the underselling imports.  Evidence such as historic domestic industry performance under

similar circumstances, or econometric data demonstrating the effect of underselling in periods of

increased demand and lower unit costs, may have been instructive.  Of course it may be *possible*,

as Plaintiffs describe, that the domestic industry did in fact suffer price suppression as a result of

subject imports.  Nevertheless, more is required for the Commission to find price suppression:

"the 'mere possibility' standard is not sufficient for a determination that must be based on

---

[19]    For example, out of nine products, domestic prices reported by suppliers for
product 1 rose from $[          ] to $[          ] per linear foot between January and June 1997, as
subject import prices fell from $[          ] to $[          ] per linear foot.  See Staff Report, at
Table V-2.  Between January and December 1998, domestic prices reported by purchasers for
product 1 rose from $[          ] to $[          ] per linear foot, as subject import prices fell from
$[          ] to $[          ] per linear foot.  See id.  For pricing product 4, domestic prices
reported by suppliers were stable at $[          ] per pound between January and September 1997,
as subject import prices fell from $[          ] to $[          ] per pound.  See id. at Table V-5.

substantial evidence." Chung Ling Co. v. United States, 16 CIT 636, 644-45, 805 F. Supp. 45, 52 (1992) (quoting China Nat'l Arts, 771 F. Supp. at 422).

The Commission further attributed price declines between the first quarter of 1997 and the fourth quarter of 1998 to lower raw material costs,[20] and price declines between the fourth quarter of 1998 and the fourth quarter of 1999 to reduced demand.[21] Final Determination, at 18. In each of those time periods, however, record evidence calls into doubt the rationale underlying the Commission's explanation for declining prices throughout the POI. For example, during the time period in which the ITC attributed declining domestic prices to lower raw material costs, demand increased sharply,[22] while in the period for which low demand was cited as the cause of declining domestic prices, raw material costs grew dramatically.[23] If raw material costs were so

---

[20]    Domestic prices for Q1 1997 and Q4 1998, respectively, were as follows:  product 1 – $[        ] and $[          ]; product 2 – $[        ] and $[          ]; product 3 – $[        ] and $[        ]; product 5 – $[        ] and $[          ]; product 6 – $[        ] and $[        ]; product 9 – $[        ] and $[          ]. See Staff Report, at Tables V-2 to V-4, Tables V-6 to V-7, and Table V-10.  The prices for differing grades of the primary inputs during Q1 1997 and Q4 1998, respectively, were as follows:  grade 304 – $[        ] and $[        ] per ton; grade 316 – $[      ] and $[      ] per ton. See id. at Table V-1.

[21]    Domestic prices for Q4 1998 and Q4 1999, respectively, were as follows:  product 3 – $[        ] and $[          ]; product 4 – $[        ] and $[          ]; product 5 – $[        ] and $[        ]; product 7 – $[        ] and $[          ]; product 9 – $[        ] and $[        ]. See Staff Report, at Tables V-4 to V-6, Table V-8, and Table V-10.  Apparent U.S. consumption declined [        ]% in the same period. See id. at Table C-1.

[22]    Demand increased [        ]% between 1997 and 1998. See Staff Report, at Table C-1.

[23]    Between Q4 1998 and Q4 1999, the costs of the differing grades of the primary inputs increased as follows:  grade 304 – from $[        ] to $[        ] per ton; grade 316 – from $[      ] to $[      ] per ton, reflecting increases of [        ]% and [        ]%, respectively. See Staff Report, at Table V-1.  In contrast, raw material costs decreased [        ]% and [        ]%, respectively, between Q1 1997 and Q4 1998. See id.

significant as to cause a reduction in prices during the earlier period, in the face of a significant

rise in demand, how then was the effect of soaring raw material costs in the later period so easily

overwhelmed by a more modest decline in demand?  Or, vice versa, if a modest decline in

demand could dictate lower domestic prices in the later period, notwithstanding rapidly

increasing raw material costs, how was a notably larger spike in demand overshadowed in its

price effects by a smaller decline in raw material costs in the earlier period?  Although "it is

within the Commission's discretion to make reasonable interpretations of the evidence and to

determine the overall significance of any particular factor or piece of evidence," Taiwan

Semiconductor Indus. Ass'n v. United States, 118 F. Supp. 2d 1250, 1260 n.15 (Ct. Int'l Trade

2000) ("Taiwan Semiconductor III) (quoting Maine Potato Council v. United States, 9 CIT 293,

300, 613 F. Supp. 1237, 1244 (1985)), the Commission here has "failed to articulate a 'rational

connection between the facts found and the choice made.'"  Bando, 787 F. Supp. at 227 (quoting

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).  The ITC

has failed to explain why, in evaluating price effects for one time period, it chose to disregard a

factor that had been presumably deemed determinative for another time period in the POI.  If

these price declines are facially significant, as the ITC's discussion seems to indicate, on remand

the ITC should clarify the relevance of demand and raw material costs to domestic prices and

explain how they may affect each other as explanatory variables for domestic price declines.[24]

---

[24]        Altx also argues that the ITC failed to establish a causal link between the
declining domestic prices, on the one hand, and lower raw material costs and reduced demand,
on the other, and that the agency thereby violated the command of Gerald Metals, 132 F.3d 716.
As discussed supra at Part I.C., this argument is without merit because Altx misreads Gerald
Metals.

The Commission also noted the high volume of nonsubject imports at a time when European (i.e., nonsubject) producers were the price leaders in the market as a basis for finding no price depression and/or suppression caused by subject imports. Final Determination, at 18. The ITC based this finding on testimony from a large U.S. purchaser, stating that "Japan was not the price leader" and explaining the means by which the European producers set prices well ahead of the industry.[25] See Hearing Transcript, at 151-52. Altx challenges the ITC's reliance on this testimony on the ground that the purchaser spoke of European price leadership solely in the context of pipe products. See id. (discussing patterns of seamless pipe pricing, including price moves on seamless pipe by two European firms; noting that "the most dramatic price falls at the mill level in the U.S. seamless pipe market occurred in 1999 . . . ."). Because pipe products reflect a minority percentage of the subject merchandise,[26] Altx argues that even if the testimony is accepted by the Commission, the statements cannot constitute substantial evidence to support a finding of European price leadership. Although the figures reflected in the percentage of the subject market covered by pipe products are not insignificant, they are not sufficiently high for the court to assume, as the ITC seems to, that any characterization of the pipe products sub-

---

[25] The Final Determination also cites a page from the Staff Report in addition to the quoted testimony. See Final Determination, at 18 n.88 (citing Staff Report, at II-21 and Hearing Transcript, at 151-52). The court is unable to ascertain what relevance the cited page from the Staff Report has to the issue of European leadership. In any event, it adds no further support to the Commission's nonsubject import finding than what is provided by the testimony.

[26] Plaintiffs identify the pipe products as [                                    ], Pl.'s Initial Br., at 32-33, and then refer to the Staff Report, in which those products identified by Plaintiffs represent [        ]% of the domestic like product and [        ]% of the Japanese subject merchandise. See Staff Report, at Table I-1. The Staff Report table also identifies a group of products as [                    ], which may or may not be relevant to calculating the proportion of the market held by pipe products. See id. Whether or not this category should be joined with the category identified by Plaintiffs does not alter the court's analysis as follows.

market should naturally apply to the remainder of the subject products. Unfortunately, the ITC

failed to respond, either in the Final Determination or in its brief, to Plaintiffs' concerns

regarding the extent to which the testimony's description of price leadership can be said to be

representative of the industry. In light of the relatively low share of the market held by pipe

products, the court cannot accept the Commission's decision to rest its conclusion on the sole

piece of testimonial evidence, without further explanation of why the ITC deems this indicative

of the broader industry. Therefore, on remand the ITC must reconsider and support its

conclusions with regard to price effects.

### III. Impact on Domestic Producers

The ITC must examine the impact subject imports have on the domestic industry,

identifying such impact by evaluating "all relevant economic factors which have a bearing on the

state of the industry in the United States," including, inter alia, performance indicia specified by

statute, such as capacity utilization, inventories, output, market share, and profits. 19 U.S.C. §

1677(7)(C)(iii). The Commission concluded that subject imports did not have a significant

adverse impact on the domestic industry based on (1) the lack of significant volume and price

effects, (2) the favorable profitability and overall improvement in the financial condition of the

domestic industry, and (3) the lack of correlation between the presence of subject imports and

trends in several important indicia of the domestic industry's condition. Final Determination, at

22. Plaintiffs challenge the Commission's impact finding on three grounds: (1) the ITC

improperly ignored the findings of the Staff Report; (2) the ITC's reliance on non-representative

data in characterizing the healthy condition of the domestic industry; and (3) the ITC's failure to

evaluate the domestic industry in light of semi-annual (as opposed to annual) data.[27]

Altx first points to findings of the Commission's econometric analysis contained in the

Staff Report, stating that dumped imports resulted in an approximately "11.3 percent to 25.3

percent reduction in revenue" for the domestic industry.  Staff Report, at F-3.  As the court

discussed supra in Part I.A., the Commission violates the statute when it fails to respond to such

clear contrary evidence contained within its own Staff Report that an interested party has brought

to the agency's attention.  19 U.S.C. § 1677f(i)(3)(B).  On remand the Commission must address

the relevance, if any, of this finding to the agency's conclusion regarding the impact of subject

imports on the domestic industry.

Altx next challenges the Commission's finding that the domestic industry continued to

perform favorably overall during the POI.  Altx observes that certain segments of the domestic

industry actually benefitted from dumped imports because companies in those segments relied on

subject imports in the production of certain finished goods.  Effectively characterizing this

observation as a unique feature of competition within the domestic industry, Altx insists that the

Commission erred in relying on data that reflected the performance of domestic producers in the

aggregate.  The true impact of subject imports, argues Altx, could only be recognized by

---

[27]     Plaintiffs also claim that the Commission's reliance on its volume and price
effects analyses to support its conclusion regarding the impact of subject imports on the domestic
industry is erroneous, based on the arguments discussed above in parts I and II.  Because the
court is remanding for the Commission to reconsider material aspects of those portions of its
decision, the Commission on remand should also reassess the relevance of its reconsidered
volume and price effects analyses to its evaluation of the impact of subject imports.

considering the condition of those domestic producers that do not import subject merchandise separately from those that do.

The evaluation by the ITC of the domestic industry in the aggregate was proper. Although one segment of the industry may benefit from dumping while another segment is harmed, the statute does not permit the ITC to manipulate its material injury analysis in favor of petitioners by focusing exclusively on the segment of the defined industry that is harmed.[28] Dumping duties may be imposed only after "the Commission determines that an industry in the United States is materially injured, or is threatened with material injury . . . ." 19 U.S.C. § 1673(2) (emphasis added). The statute defines "industry" as "the producers as a [w]hole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A) (emphasis added). The Commission is permitted to exclude from the domestic industry "a producer of the domestic like product [that] is also an importer of the subject merchandise," 19 U.S.C. § 1677(4)(B), but this exclusion occurs at the earlier stage of the Commission's analysis in which the Commission defines the domestic industry. See Final Determination, at 10-12. With regard to evaluating the impact of subject imports, the statute requires the Commission to focus on the "state of the industry," 19 U.S.C. § 1677(7)(C)(iii), as

---

[28]       Although the court speaks in terms of "segments" of the industry, it should be noted that the argument addressed here is distinct from the matter of market segmentation, which focuses on the competition between products and is not at issue here. See, e.g., Bic Corp. v. United States, 21 CIT 448, 452-54, 964 F. Supp. 391, 397-98 (1997); General Motors Corp. v. United States, 17 CIT 697, 706-11, 827 F. Supp. 774, 783-87 (1993).

that term has already been defined for purposes of the given investigation.[29]  The only narrowing

of the "industry" provided by statute in examining the impact of subject imports provides that the

Commission should evaluate only those "production operations within the United States."  19

U.S.C. § 1677(7)(B)(i)(III).  This provision has no bearing in this case.  Therefore, once the

domestic "industry" has been identified, as it apparently was without protest from Plaintiffs,[30] the

---

[29]     In SKF USA Inc. v. United States, Nos. 00-1423 & 00-1465, 2001 WL 959324, at
*7-9 (Fed. Cir. Aug. 24, 2001), the court noted the rule of statutory construction set forth in
Sorenson v. Treasury, 475 U.S. 851, 860 (1986).  As the Supreme Court has observed,

> [t]here is a natural presumption that identical words used in different parts of the
> same act are intended to have the same meaning . . . . But the presumption is not
> rigid and readily yields whenever there is such variation in the connection in
> which the words are used as reasonably to warrant the conclusion that they were
> employed in different parts of the act with different intent.  Where the subject-
> matter to which the words refer is not the same in the several places where they
> are used, or the conditions are different, or the scope of the legislative power
> exercised in one case is broader than that exercised in another, the meaning well
> may vary to meet the purposes of the law, to be arrived at by a consideration of
> the language in which those purposes are expressed, and of the circumstances
> under which the language was employed.

Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932).  Consistent with this
decision and its progeny, the Federal Circuit in SKF, while recognizing the normal presumption,
remanded the case so that the agency could attempt to provide a reasonable explanation for
applying different definitions of the same phrase.  2001 WL 959324, at *8.  The appellate court
did recognize that the two provisions containing the phrase "foreign like product" were "directed
to the same calculation."  Id.  Nevertheless, it permitted remand where the agency might have a
plausible explanation for distinguishing between "foreign like product" in the context of normal
value (which is based on actual prices), 19 U.S.C. § 1677b(a)(1)(B), and in the context of
constructed value (which is based on data reflecting typical components of prices), 19 U.S.C. §
1677b(e), particularly given the calculating complexities involved.  SKF, 2001 WL 959324, at
*8.  Unlike the two provisions at issue in SKF, the sections referring to "industry" here are not
distinct, but rather, one builds on the other.  In any case, the ITC has not attempted to support
two different definitions of industry here.

[30]     The ITC claims that Plaintiffs did not challenge the composition of the domestic
industry, ITC Br., at 33 & n.24, and Plaintiffs have not contested this characterization.

ITC properly declines to redefine the components of the "industry" to facilitate a finding of injury based on the fact that some members of the industry import subject merchandise.[31] Cf. Encon Indus., Inc. v. United States, 16 CIT 840, 842 (1992) (permitting ITC to evaluate injury based on industry as a "whole" in order to "protect[] the process from the type of maneuvering attempted by plaintiff").

Plaintiffs argue finally that even if the industry is not viewed in producer segments by reason of importation of subject merchandise, the semi-annual data collected by the agency at Plaintiffs' request undermines the Commission's finding of lack of correlation between subject imports and indicia of the domestic industry's performance. Although the ITC is not required to rely on the semi-annual data simply because it agreed to seek such information, General Motors, 827 F. Supp. at 781, its proffered reasons for discounting the semi-annual data are unreasonable. First, the ITC observed that "the semiannual data are not directly comparable to the annual data due to the absence of semiannual data from three domestic producers." Final Determination, at 22 n.109. As Plaintiffs point out, however, the three producers that did not provide semiannual data represented a relatively small portion of domestic production for 1999. See Staff Report, at Table III-1 & Table C-6 n.2.[32] While the ITC may conclude that the percentage of production

_____

[31]        That the "Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry," 19 U.S.C. § 1677(7)(C)(iii), does not mean that it is likely that Congress intended domestic entities to utilize the unfair trade proceedings to secure a competitive advantage over their domestic competitors who happen to import some of the subject product. Presumably, if the ITC deems the competitor an "importer" rather than a domestic producer, the competitor will be excluded at the outset.

[32]        The three firms with no reported semiannual data, [          ], [          ], and [       ], accounted for [       ]%, [      ]%, and [      ]% of domestic production, respectively. Staff Report, at Table III-1 & Table C-6 n.2. Thus, the non-reporting firms

represented by these three firms is significant for some reason, such a percentage is not so high

as to render the semi-annual data per se unreliable or unreflective, without further explanation by

the agency.  Second, the ITC noted that subject imports declined in the first half of 1999 at the

same time that relevant indicia of domestic industry performance declined, suggesting a lack of

causal nexus between subject imports and material injury to the domestic industry.  Final

Determination, at 22 n.109.  In this regard, as discussed supra at Part I.A., the ITC must evaluate

and respond to Plaintiffs' arguments concerning the correlation of the domestic industry's

performance with trends in the presence of subject imports.  The ITC's finding of lack of

correlation must therefore be re-examined upon remand.


## IV.  Threat of Material Injury

In addition to evaluating whether the domestic industry was materially injured by reason

of dumped imports, the Commission also concluded pursuant to 19 U.S.C. § 1673(2)(A)(II) that

there was no threat of material injury by reason of dumped imports.  The Commission is required

by statute to consider a variety of relevant economic factors before determining that dumped

imports are "imminent" and thereby threatening the domestic industry with material injury.  19

U.S.C. § 1677(7)(F)(i) & (ii).  See also Suramerica de Aleaciones Laminadas, C.A. v. United

States, 44 F.3d 978, 983-84 (Fed. Cir. 1994).  The statute cautions, however, that "[s]uch a

determination may not be made on the basis of mere conjecture or supposition."  19 U.S.C. §

1677(7)(F)(ii).

The ITC based its conclusion on the following observations:

---

together accounted for only [        ]% of U.S. production in 1999.

(1) Subject import volumes are likely to decline based on (a) declines in subject import volumes during the latter part of the POI, which the Commission had already determined not to be attributable to the filing of the dumping petition, and (b) expected increases in Japanese shipments to the home market and third-country markets, Final Determination, at 23;[33]

(2) Expected increases in Japanese production capacity and capacity utilization were not significant in light of the finding regarding likely subject import volumes, id. at 24;[34]

(3) Any increases in subject import volumes would likely come at the expense of nonsubject imports rather than the domestic like product because record evidence revealed Japanese products to be very comparable to nonsubject imports and generally preferred over domestic products, id. at 23-24;[35]

(4) Future subject imports will have little impact on prices for the domestic like product in light of the Commission's underselling findings in its present material injury analysis, id.;

(5) Inventories of U.S. importers and Japanese producers were lower in 1999 and interim 2000 than in the remainder of the POI, id. at 24-25;[36]

---

[33] Japanese shipments to third-country markets were [          ] short tons in 1997, [          ] short tons in 1998, and [          ] short tons in 1999. They were expected to increase to [          ] short tons in 2000 and [          ] short tons in 2001. Japanese home market shipments were [          ] short tons in 1997, [          ] short tons in 1998, and [          ] short tons in 1999. They were expected to increase to [          ] short tons in 2000 and [          ] short tons in 2001. See Staff Report, at Table VII-2.

[34] Japanese production capacity was [          ] short tons in 1997, [          ] short tons in 1998, and [          ] short tons in 1999, and was expected to increase to [          ] short tons in 2000 and [          ] short tons in 2001. See Staff Report, at Table VII-2. Japanese capacity utilization was [          ]% in 1997, [          ]% in 1998, and [          ]% in 1999, and was expected to increase to [          ]% in 2000 and [          ]% in 2001. See id.

[35] Questionnaire responses indicate that Japanese and European products are "very comparable" and that particularly for those products not produced by U.S. firms, European producers are the only alternative to the Japanese. Staff Report, at II-32. In addition, responses also indicate that only for "few purchases" do purchasers find U.S. sources to be the most competitive when compared with Japanese counterparts. Id. at II-33.

[36] U.S. importers' inventories were as follows: [          ] short tons in 1997, [          ] short tons in 1998, [          ] short tons in 1999, [          ] short tons in Jan.-Mar. 1999, and [          ] short tons in Jan.-Mar. 2000. See Staff Report, at Table VII-3. Japanese

(6)  Product-shifting resulting from existing antidumping duty orders on other steel products was unlikely to increase subject import volumes significantly because of "extensive" Japanese home market and increased third-country shipments, id. at 25; and

(7)  Record evidence indicated that the domestic industry was not significantly concerned with the possibility of negative effects of subject imports on the industry's production and development efforts.[37] Id. at 25.

In light of the earlier discussion regarding the Commission's present material injury analysis, the court cannot sustain the agency's first four observations as support for its conclusion regarding threat of material injury.  First, the finding that subject import volume was not likely to increase considerably was premised, in part, on the Commission's earlier conclusions that volumes were not significant and could not be attributed to the imminent filing of the antidumping petition.  See Final Determination, at 23.  The court has already found those conclusions to warrant reconsideration so that the ITC may consider Plaintiffs' relevant arguments and respond to them appropriately.  See supra Part I.  Second, because the observation regarding Japanese production capacity and capacity utilization was itself based on the finding regarding likely subject import volumes,[38] such observation must also be re-evaluated after new volume findings are made on remand.

---

producers' inventories were as follows:  [          ] short tons in 1997, [          ] short tons in 1998, [          ] short tons in 1999, [          ] short tons in Jan.-Mar. 1999, and [          ] short tons in Jan.-Mar. 2000.  See id. at Table VII-2.

[37]      Seven of twelve domestic producers reported no actual negative effects on production and development, and six of twelve domestic producers reported no anticipated negative effects on production and development as a result of subject imports.  See Staff Report, at H-4 to H-5.

[38]      "Although there is unused production capacity in Japan, we do not believe this supports an affirmative threat determination in light of our findings regarding likely subject import volume."  Final Determination, at 24.

Third, the court has found the Commission's earlier conclusion that nonsubject imports

competitively displaced subject imports and the domestic like product to be inadequately

reasoned. See supra Part I.C. After determining upon remand the extent to which nonsubject

imports are relevant, the Commission must consider, in the context of its threat of material

injury analysis, whether increases in the volumes of subject imports still "would likely be

primarily at the expense of nonsubject imports." Final Determination, at 23. Fourth, the

Commission's finding regarding likelihood of price depression and/or suppression stemmed

directly from its price effects conclusions, which the court has ordered the Commission to re-

examine. See supra Part II. The Commission must therefore undertake its threat determination

anew based on its reconsidered present material injury determination.[39]

---

[39]     Plaintiffs additionally challenge the Commission's sixth and seventh observations regarding threat of material injury. These arguments are without merit. First, Plaintiffs claim that product-shifting may still result in harm to the domestic industry because even with increased third-country and home market sales, Japanese production capacity remains high. See Pl.'s Initial Br., at 48-49. Although production capacity reveals an increased ability on the part of the foreign industry to export dumped products to the U.S. market, on its own such a theoretical possibility is insufficient to compel an affirmative threat determination of "imminent" material injury, particularly in light of historically much higher shipments to third-country markets and the home market than to the U.S. market. See Staff Report, at Table VII-2. See also Nippon Steel Corp. v. United States, 19 CIT 450, 484 (1995) ("Although petitioners have demonstrated evidence of increased capacity, the mere fact that production may increase does not warrant a threat finding.") (citing Hannibal Indus., Inc. v. United States, 13 CIT 202, 209, 710 F. Supp. 332, 337-38 (1989)). Second, Plaintiffs' contest the ITC's reliance on representations of domestic producers where those [

].

**Conclusion**

In light of the foregoing, the court cannot sustain the ITC's Final Determination. While the ITC need not address every argument and piece of evidence, see supra note 6, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions. When considered individually every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained. On remand the agency must, consistent with this opinion, reconsider its volume, price effects, and impact findings, and upon doing so, must re-evaluate its determinations regarding present material injury and threat of material injury.

_____

Jane A. Restani

JUDGE

Dated: New York, New York

This 19th day of September, 2001.