**Slip Op. 02-154**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

ALTX, INC., AMERICAN EXTRUDED
PRODUCTS, CORP., DMV STAINLESS
USA, INC., SALEM TUBE, INC.,
SANDVIK STEEL CO., PENNSYLVANIA
EXTRUDED TUBE COMPANY, and
UNITED STEEL WORKERS OF
AMERICA, AFL-CIO/CLC,

      Plaintiffs,

      v.

THE UNITED STATES, and THE
UNITED STATES INTERNATIONAL
TRADE COMMISSION,

      Defendants,

      and

SUMITOMO METAL INDUSTRIES,
NIPPON STEEL CORPORATION,
KAWASAKI STEEL CORPORATION,
NKK CORPORATION, KOBE STEEL
LTD., and SANYO SPECIAL STEEL
COMPANY,

      Defendant-Intervenors.

_____

Court No. 00-09-00477

**Public Version**

[ITC material injury second remand determination sustained.]

Dated: December 31, 2002

    Collier Shannon Scott, PLLC (David A. Hartquist, Jeffrey S. Beckington, and R. Alan Luberda) for plaintiffs.

    Lyn M. Schlitt, General Counsel, Marc A. Bernstein, Assistant General Counsel, United States International Trade Commission (Rhonda M. Hughes), for defendants.

Wilmer, Cutler & Pickering (John D. Greenwald, Leonard Shambon, and Lynn M. Fischer) for defendant-intervenors.

**OPINION**

**RESTANI, Judge:**  In Circular Seamless Stainless Steel Hollow Products from Japan, Inv. No. 731-TA-859 (final), USITC Pub. 3344 (Aug. 2000) [hereinafter Final Determination], the United States International Trade Commission ("ITC" or "Commission") found that an industry in the United States was neither materially injured nor threatened with material injury from imports of circular seamless stainless steel hollow products ("CSSSHP") from Japan that are sold in the United States for less than fair value.  Finding that decision not substantially supported by the agency record, the court remanded it to the ITC in Altx, Inc. v. United States, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) ("Altx I") with instructions to reconsider and to adequately explain its negative injury determination in light of significant arguments and evidence raised by Plaintiffs ("Domestic Producers" or "Altx") that seriously undermined the ITC's reasoning and conclusions.  In the Final Results of Redetermination Pursuant to Court Remand (Int'l Trade Comm'n Dec. 3, 2001) [hereinafter Remand Determination], the Commission, in a 3-3 vote, reversed its views and rendered an affirmative injury determination. The Remand Determination was appealed by the Defendant-Intervenors ("Japanese Producers"), and, in Altx, Inc. v. United States, No. 00-09-00477, slip op. 02-65 at 46 (Ct. Int'l Trade July 12, 2002) ("Altx II"), the court again remanded the Commission's injury determination for further consideration and explanation.

Presently before the court is the ITC's Final Results of Redetermination Pursuant to Court Remand (Int'l Trade Comm'n Aug. 26, 2002) [hereinafter Second Remand Determination], in

which the Commission, in a 3-2 vote, reversed its views again and reaffirmed its original negative injury determination.[1]  The majority here adopts in full and without change its views as set forth in its dissent to the ITC's finding of material injury in the first Remand Determination, and therefore the court must evaluate whether that decision responds to and explains various issues as directed by the court in Altx I.[2]  Answering that question in the affirmative, the court sustains the ITC's negative injury determination.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

## DISCUSSION

A material injury analysis under 19 U.S.C. § 1677(7) requires the Commission to assess (1) the volume of subject imports, (2) the effect of such imports on prices for the domestic like product, and (3) the impact of such imports on U.S. production operations of producers of the domestic like product.  19 U.S.C. § 1677(7)(B)(i) (2000).  In doing so, the Commission must

---

[1] Vice Chairman Hillman and Commissioners Bragg and Miller reaffirm their determination that the domestic injury is not materially injured, nor threatened with material injury, by reason of subject imports from Japan.  Chairman Okun and Commissioner Koplan determine that the domestic industry is materially injured by reason of subject imports.

[2] The views of the Commission's majority, while incorporated by reference into the Second Remand Determination, are actually explained and analyzed in the Commission's first Remand Determination, and, therefore, all citations to the Commission's views here will be to the Remand Determination for ease of reference.  The Second Remand Determination contains the analysis and dissenting views of Chairman Okun and Commissioner Koplan.

explain the basis for its conclusions and "address[] relevant arguments that are made by interested parties." Altx I, 167 F. Supp. 2d at 1359 (quoting 19 U.S.C. § 1677f(i)(3)(B) (2000)). It does not matter if the arguments of the parties are easily dispensed with or require closer examination, if the Commission does not make its thinking clear. The court can only review the reasoning that the Commission expresses. Because the Commission's Final Determination lacked the required support in the record and failed to examine relevant arguments made by interested parties, the court remanded all three aspects of the Commission's negative injury finding for further proceedings in Altx I. Id. at 1374. The Commission has now explained itself in sufficient detail for the court to review its determination.

## I. Volume

The statute requires the ITC to consider "whether the volume of imports of the [subject] merchandise . . . is significant." 19 U.S.C. § 1677(7)(C)(i). In its Final Determination, the Commission concluded that subject import volume was not "significant" during the period of investigation ("POI") for four reasons: (1) subject import volumes actually decreased during the period when the domestic industry performed poorly; (2) the "consistent" and "substantial" drop of subject import volume was not in response to the filing of the petition, as Domestic Producers had argued; (3) nonsubject imports may have displaced domestic like products rather than subject imports; and (4) competition between subject imports and the domestic like product was somewhat attenuated. Altx I, 167 F. Supp. 2d at 1357-58 (citing Final Determination at 15-17). Of those grounds, the court found in Altx I that only the ITC's determination with respect to attenuated competition was supported by substantial evidence. Id. at 1364. The remaining three justifications were remanded to the Commission for further consideration and clarification in

light of meaningful conflicting evidence adduced by Plaintiffs.

**A. Correlation Between Import Volumes and Performance of the Domestic Industry**

In its Final Determination, the Commission heavily relied upon a decline in subject import volume, market share, and value in the latter part of the POI to support its finding that subject import volumes were not significant. See id. at 1358. Because the domestic industry actually weakened when subject import volumes "consistently and substantially" declined in 1999, the Commission concluded that there was no correlation between subject imports and the condition of the domestic industry, notwithstanding the Commission's acknowledgement that subject import volumes nearly doubled between 1997 and 1998. Id. (quoting Final Determination at 17).

Domestic Producers in Altx I, however, claimed that the domestic industry's performance was directly linked to increased export sales, and that controlling for exports would reveal a weakening domestic industry due to [                                        ] between 1997 and 1998, the period during which subject import volumes almost doubled. Id. Domestic Producers also cited a "marked decline" in the domestic industry generally in 1999, and claimed that increased purchases of subject imports during 1997 and 1998 may have been responsible for the industry's later decline. Id. Finally, Domestic Producers challenged the Commission's rejection of its staff's econometric analysis, which concluded that subject imports result in a 7.2% to 16.1% reduction in the domestic industry's output. Id. In light of the Commission's failure to address this relevant conflicting evidence in its Final Determination, the court remanded it with instructions to consider these points and give a reasoned explanation for the ultimate decision

made. Id. at 1359-60.

### 1. Condition of the domestic industry

The ITC's Second Remand Determination again makes a negative determination as to the significance of the subject imports. Remand Determination at 8. The Commission first reiterates key points raised in its first negative injury determination with respect to the correlation between subject import volume and the condition of the domestic industry. During 1997 and 1998, years in which subject import volumes almost doubled, important indicators of the domestic industry's condition all rose to their peak annual levels for the period, including domestic production, capacity utilization, net sales, operating income, and operating income ratio. Id. at 4.

In response to Domestic Producers' argument in Altx I regarding the actual condition of the industry during those years if the Commission would control for increased export sales, the Commission recognizes that domestic shipments declined from 1997 to 1999,[3] but does not find that controlling for export shipments indicates a weakened domestic industry in 1998. Id. at 5. The indicators of the domestic industry's condition, especially operating income, predominantly reflect that domestic sales held a strong majority of the Domestic Producers' total sales in every year of the investigation period.[4] Id. Moreover, because Domestic Producers failed to request that profitability or other data be collected separately for export shipments during the investigation, or proffer that information themselves, the Commission explains that it is unable to

---

[3] U.S. shipments declined from [        ] short tons in 1997 to [        ] short tons in 1998, and fell to [        ] short tons in 1999. Remand Determination at 5 n.10.

[4] Of the Domestic Producers' total shipments during the POI, the value of export shipments was only [        ] percent in 1997, [        ] percent in 1998, [        ] percent in 1999, and less than [        ] percent in interim 2000. Id. at 4.

"control" for exports other than to consider the changes in shipment levels for domestic and

export shipments. Id. n.12. The ITC also explains that the record suggests a differing product

mix between U.S. and export shipments due to the substantial differences in shipment unit

values,[5] but that the record contains no data to explain these differences or the cost of goods sold

for each shipment type. Id.

Irrespective of the ITC's conclusions regarding the earlier years of the POI, the

Commission finds that trends between 1998 and 1999 are most relevant to the significance of

subject import volumes under § 1677(7)(B)(i)(I) because the domestic industry performed well

overall during 1997 and 1998, when subject import volumes had greatly increased, but declined

in 1999, when subject import volume and market share fell but nonsubject market share rose

sharply.[6] See infra Part I.C (discussing the impact of nonsubject imports on the producers of the

domestic like product). The Commission ultimately finds that the weakened condition of the

domestic industry in 1999 – production, shipments, capacity utilization, operating income, and

market share were all lower than in previous years – cannot be attributed to subject imports

_____

[5] For example, in 1999, the unit value of export shipments was [          ] per short ton, while the unit value of domestic shipments was [                    ] per short ton. Id. at 6 n.12.

[6] The Commission explains:
[W]hile subject imports took market share from the nonsubject imports early in the [POI] when the domestic industry's condition was healthy and improving, we find that subject imports' loss of market share to nonsubject imports later in the period, when the [domestic] industry's condition declined, to be most probative of the relative (or lack of) significance of subject import volume.
Id. at 6 n.13. The market share of nonsubject imports was greater than subject import market share for the entire POI. Id. & n.15 (stating that subject import and nonsubject import market shares were, respectively by volume, [     ] percent and [     ] percent in 1997, [     ] and [     ] percent in 1998, and [     ] and [     ] percent in 1999) (citing Staff Report at Table C-1)).

because at that time both subject volume and market share were lower than in 1998. Id. at 7.

In response to the ITC's Second Remand Determination, Domestic Producers argue that the Commission has failed to properly analyze the correlation between the health of the domestic industry and subject import volumes as ordered by the court in Altx I. See Plaintiffs' Objections to the International Trade Commission's August 26, 2002 Remand Determination at 3 [hereinafter Pls.' Objections]. Domestic Producers oppose the ITC's position that it is not required to control for exports in reaching its volume determination because, in their view, the court ordered the ITC to do so in Altx I. Id. at 5 n.2 (citing Altx I, 167 F. Supp. 2d at 1364). Careful reading of Altx I, however, supports the Commission's position that the court did not specifically order it to consider profitability or other such data relating to exports, but rather ordered it to provide a reasoned explanation of its finding regarding the lack of correlation between subject import volumes and the health of the domestic industry in light of Domestic Producers' arguments, which it has done here. See Altx I, 167 F. Supp. 2d at 1360; see also Defendant's Comments on Plaintiffs' Objections to the International Trade Commission's August 24, 2002 Remand Determination at 6 [hereinafter Def.'s Comments].

Focusing on their argument that increased export sales masked a weakening domestic industry in the earlier years of the POI, Domestic Producers continue to urge, as they did in Altx I, that they lost market share and domestic shipment volume due to the increase in subject imports during 1997 and 1998, a time during which demand had increased by [           ]. Pls.' Objections at 5-6 (citing Staff Report at Table C-1). According to the Domestic Producers, their lack of participation in the expanding 1998 market on a pro-rata basis "is itself indicative that subject imports were significantly injuring the domestic industry during the period through

1998." Id. at 6. The Commission explains, however, that Domestic Producers' approach oversimplifies the issue by ignoring the apparently differing product mixes between domestic and export shipments. Def.'s Comments at 7; see supra note 5 and accompanying text. The ITC correctly points out that it would have been unreasonable for it to conclude that increased export sales, measured either in units or value, masked a weakening domestic industry without more data. See Def.'s Comments at 8. And, contrary to Domestic Producers' position, it was their burden to provide such case-specific data to support their claim or to request, at the beginning of the investigation, that the ITC gather it. See Asociacion De Productores De Salmon Y Trucha De Chile AG v. U.S. Int'l Trade Comm'n, 180 F. Supp. 2d 1360, 1367-68 (Ct. Int'l Trade 2002) (sustaining the ITC's remand views based on use of best information available). The Commission must make its decision based on the available facts.[7] 19 U.S.C. § 1677e.

Focusing on the relative market share held by domestic and foreign producers of CSSSHP, Domestic Producers concede that the domestic industry lost volume and market share to nonsubject imports between 1997 and 1999, but maintain that a substantial portion, [ ], of the total loss of market share over the POI was to subject imports. Pls.' Objections at 6. Domestic Producers also stress that they did earn back market share when subject imports declined in 1999 and 2000, and thus argue that the Commission's view that the decline in market

_____

[7] The Commission also claims failure to exhaust administrative remedies on this issue because Domestic Producers raised this argument for the first time in their reply brief in Altx I. Def.'s Comments at 8 (citing Pls.' Reply Br. at 2-3 (Apr. 2, 2001)). The Government, however, had an opportunity to plead failure to exhaust at oral argument or in a supplemental filing. As the Commission failed to do so, the court ordered it to consider Domestic Producers' arguments on this point in Altx I, 167 F. Supp. 2d at 1358-60.

share over the POI cannot be attributed to subject imports is "simply not true."[8] Id.

Contrary to Domestic Producers' characterization of the Second Remand Determination, however, the Commission did not find that the market share attributable to subject imports was not significant, but rather, pursuant to the statute, that subject import *volume* was not significant notwithstanding the volume increases during the POI. Def.'s Comments at 8. Domestic Producers' focus on the relative market share held by the domestic industry and subject imports, regardless of the trends in the volume of the subject imports, price trends, or other factors, is misplaced. This part of the ITC's injury determination focuses on the significance of the volume of subject imports during the POI, and the Commission is obligated to examine and weigh all of the record evidence, and not simply to focus on one factor to the exclusion of other conflicting evidence. See 19 U.S.C. § 1677(7)(C)(i). Additionally, market share is just one of many economic factors considered by the ITC under the impact prong of the injury analysis. § 1677(7)(C)(iii).

Based upon the foregoing, the court finds that, while there is conflicting evidence in the record, there is substantial evidence to support the ITC's finding that increased subject import volume was not significant in the context of rising domestic production, capacity utilization, net sales, operating income, and operating income ratio, as well as increased nonsubject import volume.

---

[8] Domestic Producers state: "Where subject imports account for [                    ] of the market share loss, and remain [                                                    ] they are significant by any definition." Pls.' Objections at 7.

### 2. Import volumes and consumption

The Commission's Second Remand Determination rejects Domestic Producers' argument from their first appeal that subject imports during 1997 and 1998 may have been responsible for material injury to the domestic industry in 1999. The Commission points to a decrease in importers' inventories during 1997 and 1998 and a large increase, [                    ], in consumption in 1998[9] to support its finding. Remand Determination at 7 n.19. The decrease in importers' inventories "is contrary to the trend one would expect if merchandise present in 1997 were to have an adverse effect on the domestic industry in 1998." Id. Moreover, the substantial increase in consumption in 1998 made it likely that earlier imports were consumed and had cleared the market by 1998. Id. Therefore, the Commission concludes that the record does not support Domestic Producers' contention that subject imports in 1997 and 1998 had a material impact on the domestic industry in 1999. Id.

Domestic Producers claim that this analysis is flawed for several reasons. First, Domestic Producers attempt to minimize the significance of the [          ] increase in consumption between 1997 and 1998, claiming the ITC's figures reflect apparent, not actual, consumption.[10] As discussed in Part I.A.1 supra, Domestic Producers rely on this same figure in other portions of their brief to bolster their claim that subject import volumes were significant notwithstanding the overall positive performance of the domestic industry during this time period. Either an increase

---

[9] Consumption increased [                    ], from [          ] short tons to [          ] short tons, in 1998. Remand Determination at 7 n.19 (citing Staff Report at C-4, Table C-1).

[10] Domestic Producers argue that the staff report's U.S. consumption figures are simply the sum of imports and domestic shipments, and that they do not provide any information about how much CSSSHP was actually consumed during this period. Pls.' Objections at 8.

in consumption is significant or it is not. Domestic Producers cannot logically argue in support

of one claim that such an increase – and their inability to benefit from the growing domestic

market – is significant, and then for another point criticize and minimize the significance of the

very same figure. Furthermore, the ITC explains that its characterization of consumption is

based here, as always, on the sum of domestic shipments, subject imports, and nonsubject

imports. Def.'s Comments at 9. There can be no exact measure of demand in this investigation

because, as the parties agree, the measure of demand for CSSSHP is derived from the activity

level in other industries. Thus, for the ITC to make conclusions regarding consumption based on

any other data would both speculative and contrary to law.[11] Therefore, this argument lacks

merit.

Second, Domestic Producers assert that the available record evidence "conclusively"

demonstrates that a significant portion of imports of subject CSSSHP [

                                                  ]. Pls.' Objections at 8. Domestic Producers,

however, base this broad characterization on data provided by one purchaser. See id. The

Commission obtained purchaser questionnaire responses from 30 firms, and the record does not

reflect that any other firm had an experience similar to the one relied upon by the domestic

industry. Def.'s Comments at 10 (citing Staff Report at II-24).

The court finds that the Commission's determination on this issue is correctly based on

the industry as a whole, see Altx I, 167 F. Supp. 2d at 1369-70, and its ultimate conclusion

rejecting Domestic Producers' argument that high subject import volumes in 1997 and 1998

_____

[11] Although Domestic Producers criticize the ITC's measure of demand in this
investigation, they offer no alternative measures. Def.'s Comments at 10.

caused them material injury in 1999 is supported by substantial evidence in the administrative

record.

### 3. ITC's rejection of its staff's economic model

19 U.S.C. § 1677(7)(C)(iii)(V) requires the Commission to consider the magnitude of the

dumping margin determined by the Department of Commerce ("Commerce") as part of its

consideration of the impact of imports.  In the past the Commission has utilized an economic

model ("COMPAS") to estimate the effects of dumped imports on the domestic industry, and the

model is based in part on Commerce's estimated dumping margin.  See Staff Report at F-3.  In

recent years, however, the Commission has not relied upon the model,[12] but it is still part of its

staff's input.  The Commission has not indicated that it makes use of margins in any other

manner.  In the face of the statute it would not be appropriate for the Commission to decline to

consider margins as a general proposition.  Nonetheless, COMPAS is merely one tool available

to the Commission, and the model alone cannot substitute for consideration of the statutory

factors and the record data.  The court has repeatedly recognized that the ITC may reasonably

base a decision upon facts in the record that vary from a theoretical economic model.  See Altx I,

167 F. Supp. 2d at 1359-60; Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1058-59

(1995); Alberta Pork Producers' Mktg. Bd. v. United States, 683 F. Supp. 1398, 1401 (Ct. Int'l

Trade 1988).  The Commission, however, cannot ignore interested parties' arguments based on

the model, especially where, as here, the model's results undermine the Commission's

---

[12] Commissioners Bragg, Miller, and Hillman state that they do not generally rely on the model in making their material injury determinations.  Remand Determination at 8 n.21.  How they usually consider margins is not made clear, but the court concludes that even if they generally relied on the COMPAS model, it was reasonable not to do so in this case.

determination.  See Altx I, 167 F. Supp. 2d at 1359-60.

The Commission has now responded to Domestic Producers' argument that it must utilize

the COMPAS result, and this reflects its consideration, if not its reliance, on the margins

calculated in this case.[13]  See Committee of Domestic Steel Wire Rope & Specialty Cable Mfrs.

v. United States, 201 F. Supp. 2d 1287, 1302-04 (noting that while the ITC has a statutory

obligation to consider the dumping margin, it has little significance if there is no connection

between the pricing of the foreign product and the condition of the domestic industry).  The

Commission "ha[s] closely examined the empirical data in the record and determined it to be

more useful than conclusions based on the results of the COMPAS model."  Remand

Determination at 8.  The antidumping margin estimated by Commerce was not based on data

provided by the Japanese respondents, but was instead based on best information available

because the Japanese respondents chose not to provide data.[14]  See id. at 9 n.24 (citing 65 Fed.

Reg. 42,985, 42,985-86 (July 12, 2000)).  The Commission explains:

> The model assumes that this margin will be passed through in full to the domestic
> market, i.e., that the weighted average margin of 121.3 percent has resulted in a
> substantial decrease in the price of the subject imports in the U.S. market (by more
> than 50 percent).  This suggests a pricing level for subject imports that is so high that
> they would not have been in the U.S. market at a Commerce-determined fair price.
> Given the historic and established role that these subject imports have played in the
> U.S. market, including product niches unfilled by domestic producers, we do not find

---

[13] In this determination, the Commission recognizes its statutory duty to consider the magnitude of the dumping margin, but simply notes that the margins on imported CSSSHP ranged from 62.14 percent to 156.81 percent.  Id. at 13 n.43 (citing 65 Fed. Reg. 42,985, 42,986 (Dep't Commerce July 12, 2000)).  The Commission also considered its staff's COMPAS model which utilizes the dumping margins, but ultimately rejected the model's result.

[14] One might argue that this is a good reason to use the margin; that is, either this is the margin expected or manipulation of the proceedings would be discouraged by use of the margins. The ITC, however, is not compelled to accept such reasoning.

this to be a reasonable conclusion, thus further limiting the usefulness of the COMPAS model in this investigation. Finally, the COMPAS model estimates the possible effect on revenue, but not profitibility or other financial data such as cost of goods sold – both important factors in our determination in this case.

Id.

Domestic Producers continue to urge that the results of the COMPAS model contradict the ITC's negative injury determination and claim that the Commission did not adequately explain its rejection of the model. Pls.' Objections at 11-14. The parties all agree, however, that the results of the econometric model contradict the Commission's findings in this investigation. It is the quality of the Commission's explanation that is the sole issue on appeal. In Altx I, the court stated, "whatever discretion the Commission may have to reject deliberately the conclusions found in the agency's Staff Report, . . . it may not through its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclusions where an interested party has specifically brought the possibly conflicting evidence to the agency's attention. . . . [T]he Final Determination lacks needed explanation." 167 F. Supp. 2d at 1359-60 (citation omitted).

The court finds that the ITC's Second Remand Determination is in compliance with the court's directions in Altx I and that its rejection of results of the COMPAS model is reasonable and supported by substantial evidence. The determination explains in substantial detail why, in this investigation, the Commission viewed the theoretical COMPAS model, which was based on suspect margins, to be less helpful than the other data of record. The Commission has therefore complied with the court's instructions in Altx I by providing a rational explanation for its rejection of the results of the COMPAS model. See 167 F. Supp. 2d at 1359-60.

**B. Declining Volumes as a Response to the Filing of the Antidumping Petition**

In Altx I, the court held that the Commission had not offered a reasonable explanation for its conclusion that any pre-filing awareness of the antidumping petition did not impact the volume of subject imports. Id. at 1360-61. While recognizing that the ITC has discretionary authority to reduce the weight accorded to data it finds to be skewed due to the filing of the antidumping petition, the court nevertheless found that the Commission had abused its authority in engaging in speculation on this issue rather than making a reasoned decision based upon substantial record evidence. Id. at 1361 & n.10. Thus, the court instructed the ITC to give a reasonable explanation supporting its 13-26 week time period for assessing whether a drop in subject import volume could be attributed to the filing of the petition. Id. at 1360-61.

On remand, the Commission has considered whether the filing of the petition on October 26, 1999, affected the volume of imports in mid-1999 and early 2000 such that it should give less weight to import volumes during those periods. Remand Determination at 6. Responding to the court's concerns over the time frame utilized by the ITC, the Commission explains that the weight of the record evidence indicates a general delay of 13-26 weeks between the placement of an order and the arrival of the subject imports. Id. at 7 n.18 (citing CR at II-29, PR at II-17). The record as a whole therefore does not support Plaintiffs' argument that orders could be halted in as little as two weeks before export, and even if such cancellations did occur in mid-to-late 1999, the Commission notes that those cancellations still would have occurred after the largest volume decrease of subject imports. Id. The sharpest decline in subject imports occurred between the second half of 1998 and the first half of 1999, well before the filing of the petition, and therefore the Commission does not consider the decreased volume to be a result of the filing of the petition

or to reflect the impact of rumors of an imminent petition.  Id. at 7 (citing Staff Report at C-17, Table C-6).

Though Domestic Producers continue to challenge the adequacy of this explanation, the court finds that it is supported by substantial record evidence.  Domestic Producers cite minimal record evidence in support of their claim that rumors of an imminent filing caused decreased subject import volumes.  Altx bore the burden of producing evidence to support its assertion of rumors of an imminent petition.  Altx I, 167 F. Supp. 2d at 1361 n.8.  The ITC, as the trier of fact, weighs the evidence in the record and is entitled to accord more weight to evidence it finds most probative to the question at issue.  See Altx I, 167 F. Supp. 2d at 1360 n.9; Titanium Metals Corp. v. United States, 155 F. Supp. 2d 750, 759-60 (Ct. Int'l Trade 2001); Floral Trade Council v. United States, 20 CIT 595, 601 (1996).  Given the relative weakness of the evidence Domestic Producers proffered in support of their claim of rumors that, in their view, affected the business practices of the Japanese Producers collectively, it was reasonable for the Commission not to reduce the weight accorded to post-petition information after considering the record as a whole.

**C. Displacement of the Domestic Like Product by Nonsubject Imports**

In Altx I, the court noted that "a positive correlation concerning nonsubject import volumes, in conjunction with other factors, may be sufficient to cut the causal link between subject imports and any harm suffered by the domestic industry."  167 F. Supp. 2d at 1362. Nevertheless, the court found that the ITC's general reference to increasing nonsubject market share over only a portion of the POI, 1998 to 1999, was insufficient to sustain its apparent conclusion that "nonsubject imports were so significant as to have displaced subject imports and the domestic like product."  Altx I, 167 F. Supp. 2d at 1363.

On remand the Commission provides the required additional explanation the court needs to sustain its finding that the increased volume of nonsubject imports in the latter part of the POI, in addition to other factors addressed in the Second Remand Determination, gives rise to a reasonable inference that nonsubject imports may have displaced both subject imports and the domestic like product, thus detracting from the significance of subject import volumes. The ITC first explained why it found 1998 and 1999 to be most relevant to its analysis: any injury that occured would have been in 1999 in light of the domestic industry's strong performance in 1997 and 1998. Remand Determination at 6. As discussed in Part I.A.1, subject import volume and market share fell between 1998 and 1999, at the same time that nonsubject import volume increased and nonsubject import market share greatly increased. Id.; see supra note 6 (explaining that subject imports took market share from nonsubject imports early in the POI, when the Domestic Producers' condition was healthy and improving, but that subject imports lost market share to nonsubject imports in the latter portion of the POI, when the domestic industry's condition declined). Unlike subject imports, nonsubject imports actually increased their market share through 1999 and the first quarter of 2000, and, in fact, nonsubject imports held more market share than subject imports for the entire POI. See supra note 6 (detailing the percentages of subject and nonsubject import market shares througout the POI). Finally, record evidence that some purchasers perceive nonsubject hollow products to be a more competitive alternative to Japanese products than the domestic product supports the Commission's view. As the court stated in Altx I, "the ITC is permitted to conclude that other factors [such as increased nonsubject import volume] . . . certainly undermine the notion that dumped imports are a cause of injury . . . [to] the domestic industry." 167 F. Supp. 2d at 1362. The ITC has thus provided sufficient

support for its inference that nonsubject import volumes were a significant competitive presence in the market, displacing both domestic and subject CSSSHP.

### D. Conclusion

In summary, the court finds that the four reasons offered by the Commission for its negative determination as to the significance of subject import volumes are supported by substantial evidence. The affirmed finding of attenuated competition in Altx I is an important aspect of the court's conclusion here. See id. at 1364. Furthermore, the Commission's Second Remand Determination addressed all of the issues and conflicting evidence relating to the significance of subject import volume as ordered by the court in Altx I and gave rational explanations for rejecting Domestic Producers' arguments. As noted by the court before, the Commission may permissibly focus its analysis on a specific time frame within the POI, and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Id. at 1363 (citations omitted). Therefore, the Commission's conclusion that the subject import volume was not significant is sustained.

## II. Effect of Subject Imports on Prices for the Domestic Like Product

In evaluating the price effects of subject imports from Japan, the Commission must consider whether: (1) there has been significant price underselling by the imported merchandise as compared with the domestic prices for like products; and (2) subject imports have the effect of depressing domestic prices or preventing price increases, that would have occurred otherwise, "to a significant degree." 19 U.S.C. § 1677(7)(C)(ii). In its Second Remand Determination, the Commission again determined that underselling was not significant and that subject imports

caused neither price depression nor price suppression. Remand Determination at 12-13.

**A. Significance of Underselling**

In its original determination, the Commission found that underselling was not significant because there was a lack of correlation between (1) underselling and price trends, and (2) underselling and the condition of the domestic industry. Altx I, 167 F. Supp. 2d at 1365. In using its conclusions on price suppression and depression as a basis to support its finding on the siginficance of underselling, the court found that the ITC failed to properly engage in the two separate statutory inquiries and held that "the ITC must consider on remand whether a lack of correlation between underselling and the condition of the domestic industry remains after evaluating Plaintiffs' arguments, and if so, whether that factor is sufficient for the Commission to conclude that underselling is not significant." Id. at 1366.

The Commission's Second Remand Determination again finds that there has not been significant price underselling of subject imports as compared with prices of domestic like products. Remand Determination at 12. Though the ITC recognizes that the pricing data it collected indicate "extensive" underselling by subject imports throughout the POI, and "substantial margins" of underselling, the Commission nevertheless finds such underselling insignificant due to a lack of correlation between underselling and the condition of the domestic industry. Id. at 10. The Commission finds that despite persistent underselling by subject imports and declining domestic prices, the domestic industry's condition was strong between 1997 and 1998, markedly improved in 1998 when subject imports were at their highest levels,[15] and

_____

[15] For example, the quantity of the Domestic Producers' net sales and gross profit increased in 1998. Both operating income and net income nearly doubled as well. Remand Determination at 10 (citing Staff Report at Table VI-1).

remained favorable through interim 2000. Id. Moreover, underselling was prevalent despite

shifts in prices for the domestic like products and shifts in subject import volume.[16] Id. Finally,

rather than experience operating declines due to subject imports, the Domestic Producers

experienced an improvement in their performance. Id. Based on this lack of correlation between

underselling and the domestic industry's condition, the Commission did not find the underselling

to be significant. Id. at 10-11.

Domestic Producers' claim that the Commission did not consider their arguments lacks

merit. The Commission noted that its conclusion was not changed by taking into account export

shipments and that it found the empirical data in the record to be more useful than conclusions

based on the COMPAS model, as explained supra Part I. See id. at 10 nn.29-30. Altx's

argument that the ITC erred in failing to address semiannual data fails because, as a general

proposition, the Commission is not required to rest its findings on the semiannual data.

Copperweld Corp. v. United States, 12 CIT 148, 161, 682 F. Supp. 552, 565 (1988). Here, the

Commission finds that semiannual data does not undermine its finding that underselling was not

significant. See Def.'s Comments at 22-23 (explaining that in spite of the underselling by the

subject imports, the semiannual data show that the performance of the domestic industry did not

improve when subject imports decreased). Domestic Producers attempt to show a correlation

between the underselling and the negative performance of the domestic industry, claiming that

underselling is concentrated within the last half of 1998 and the first half of 1999, when subject

---

[16] "[U]nderselling was prevalent during periods when the domestic prices were stable or rising, as well as during periods of decling prices and at a time when the volumes of imports associated with the underselling were decreasing." Id. (Citing Staff Report at Tables V-2 - V-10 and Table C-1) (footnotes omitted).

import volume and market share exceeded the performance of the domestic industry. See Pls.' Objections at 21-22. This claim is false, as the record data shows that underselling was prevalent throughout the POI . See Staff Report at Tables V-2, V-4, V-5, V-6, V-7, V-9, & V-10 (detailing the underselling margins of various pricing products). Therefore, in view of the trends in imports and industry performance factors, as well as the fact that underselling occurred during 1998 when the industry's performance indicators were strong, the Commission's finding that the underselling is not significant is reasonable and supported by substantial evidence.

**B. Effect of Underselling on Price Depression and/or Suppression**

In Altx I, the court ordered the ITC to: (1) explain why it rejected the findings of its Staff's econometric analysis that dumped imports resulted in a "3.0 percent to 11.0 percent reduction in price" for domestic like products; (2) clarify the relevance of raw material costs and demand to domestic prices and how those two factors interrelate as explanatory variables for declines in domestic prices; and (3) reconsider and provide support for its conclusion on the price leadership of nonsubject (specifically, European) imports. 167 F. Supp. 2d at 1366-69. The Commission's Second Remand Determination again reaches the conclusion that undersold subject imports have not suppressed or depressed domestic prices to a significant degree. Remand Determination at 12-13.

The court first notes that the ITC failed to respond specifically to the court's instruction to explain its rejection of the COMPAS model's conclusion on domestic price depression. Contrary to Domestic Producers' view, however, this is not fatal to the Second Remand Determination. The Commission in fact explained in substantial detail, and reiterated throughout its decision on remand, why it rejected the COMPAS model with respect to other aspects of the investigation.

See discussion infra Part I.A.3. Having provided a reasonable explanation for generally rejecting the theoretical model's conclusions in favor of the Commission's own based on data in the administrative record, Domestic Producers' argument that the court should remand the negative injury determination due to the ITC's failure to specifically reject the model's price depression conclusions is unfounded. Second, the court reiterates its finding in Altx I that the Commission reached a reasonable conclusion in finding that, due to the lack of correlation between underselling and domestic prices, subject imports did not result in significant domestic price suppression. 167 F. Supp. 2d at 1366-67.

In addressing the court's instruction to the ITC to clarify its findings on raw material costs and decreased demand, the Commission first states that a decline in input costs during the POI explains "[a]t least some of the price declines" suffered by the Domestic Producers. The Commission explains that, while most of the pricing data indicate declines of about 10 percent or less between the first quarter of 1997 and the fourth quarter of 1998 (with some price levels increasing), unit raw material costs and the total unit cost of goods sold fell 11 percent between 1997 and 1998. Remand Determination at 11 (citing Staff Report at Tables V-2 - V-10 and VI-4). Overall input costs continued to fall in 1999, despite increased costs for certain raw materials such as nickel and chromium, which the ITC found consistent with price trends for that year. Id. (citing Staff Report at Table V-1). Addressing demand, the Commission notes that the domestic industry's condition improved in 1998, when demand rose, in spite of falling input costs and the corresponding declining prices. But in 1999, both demand and input costs fell, offering an explanation for the price declines during that year. Id. The Commission concluded that "the weight of the evidence supports our finding of no significant price depression or suppression by

reason of subject imports." Id.

        The Commission next addressed the price effects of nonsubject imports. As noted supra Part I.C, nonsubject imports surpassed subject imports in both absolute volume and market share throughout the POI. In 1999, nonsubject import volume and market share surged, while subject import volume and market share declined and the domestic industry suffered from declining prices and falling performance indicators. Id. at 12. The Commission seems to have reconsidered its finding that European producers of nonsubject imports were the price leaders in the market during the domestic industry's downturn, see Altx I, 167 F. Supp. 2d at 1368, stating instead in its Second Remand Determination that there is record evidence that price leadership is diffused among several large firms, including some nonsubject producers and two domestic producers. Remand Determination at 12 n.39. Several purchasers indicated that European producers were the price leaders from June 1998 to November 1999, which would have coincided with the surge in nonsubject import volumes and the domestic industry's declining condition. Id. at 12 (citing CR at II-34, PR at II-21; Tr. at 151-52 (Mr. Bootz)). Other evidence often points to domestic producer Sandvik as the true price leader during the period. Id. at 12 n.39 (citing CR at II-10, PR at II-6). The Commission correctly points out that "the Court has recognized that lack of price leadership by subject producers or evidence of price leadership by the domestic producers suports a finding of no adverse price effects by reason of subject imports." Id. (citing Angus Chemical Co. v. United States, 20 CIT 1255, 1269, 944 F. Supp. 943, 954 (1996), aff'd, 140 F.3d 1478 (Fed. Cir. 1998); Maverick Tube Corp. v. United States, 12 CIT 444, 453-54, 687 F. Supp. 1569, 1578 (1988)). Finally, the ITC notes that it was only able to confirm Domestic Producers' lost sales allegations in a very small fraction of cases. Id. at

12 (citing CR at V-29, V-32, PR at V-13, V-14, Staff Report at Table C-1). Therefore, the Commission does not find that subject imports have suppressed or depressed domestic prices to a significant degree. Id. at 12-13.

Domestic Producers object to the ITC's findings on the effects of underselling on price depression and/or suppression on various grounds, none of which the court finds persuasive. The record evidence clearly supports the Commission's findings with respect to declining raw material and input costs. Its focus on the 1998-99 time period is within the Commission's discretion, see Altx I, 167 F. Supp. 2d at 1363, and is reasonable in light of record evidence that the domestic industry would have suffered material injury, if at all, in 1999. As noted above, the Commission no longer focuses solely on European price leadership to bolster its explanation for falling domestic prices, but instead finds that price leadership is diffused among several large firms, including domestic producers, nonsubject producers, and subject producers. Based on the additional record evidence cited by the ITC, the Commission could reasonably find that price leadership is not limited to subject producers from Japan and could reasonably be attributed to the nonsubject imports, particularly in view of the rising nonsubject import volumes and the corresponding decline in the domestic industry's performance. Based on the foregoing, the court concludes that the ITC has complied with the court's instructions in Altx I to "reconsider and support its conclusions with regard to price effects," and that the Second Remand Determination is supported by substantial evidence and is otherwise in accordance with law.

**III. Impact of Subject Imports on Domestic Producers**

In the third prong of the Commission's material injury determination, the ITC must "evaluate all relevant economic factors which have a bearing on the state of the industry in the

United States," including sales, market share, profits, productivity, capacity utilization, and prices. 19 U.S.C. § 1677(7)(C)(iii). On remand, the Commission again concludes that subject CSSSHP imports have not had an adverse impact on the domestic industry based, among other things, on: (1) the lack of significant volume and price effects; (2) shipments, domestic production, capacity, capacity utilization, and capital expenditures either essentially remained steady from 1997 to 1998, or increased, but then decreased between 1998 and 1999, at the same time that apparent U.S. consumption decreased, subject imports sharply declined, and nonsubject imports experienced a sharp increase; (3) substantial increases in productivity over the entire POI; and (4) the lack of correlation between operating income and subject imports. Remand Determination at 13. Regarding the court's direction to reconsider Altx's argument regarding semiannual data, the ITC stated that it weighed the evidence in the record and determined to utilize the annual data, which the Commission finds to be the most complete and most probative data. Nevertheless, the ITC did consider the semiannual data and found that it did not contradict the conclusions reached on the basis of the annual data. Id. at 16 n.61.

Domestic Producers again contest the Commission's failure to separately explain its rejection of the COMPAS model in its impact analysis, but the court rejects this argument for the same reasons expressed in its consideration of the Commission's volume and price analyses, supra. Plaintiffs' argument that a comparison of domestic producers that import CSSSHP from Japan with those that do not reveals the injurious impact of subject imports on the industry as a whole must fail for the reasons the court explained in Altx I, 167 F. Supp. 2d at 1369-71. Domestic Producers also unsuccessfully continue to reiterate arguments already rejected by the court in Parts I and II, supra. The court therefore upholds the Commission's impact analysis as it

is supported by substantial evidence.

## IV.  **Threat of Material Injury**

In addition to determining whether the domestic industry suffers present material injury by reason of subject imports, the Commission must determine whether the domestic industry is threatened with material injury by evaluating whether "further dumped . . . imports are imminent and whether material injury . . . would occur unless an order is issued or a suspension agreement is accepted."  19 U.S.C. § 1677(7)(F)(ii).  The Commission adopts its prior views regarding the threat of material injury and, based on the relevant statutory factors, finds that the domestic industry is not threatened with material injury from imports of CSSSHP from Japan that are sold in the United States for less than fair value.[17]  Remand Determination at 17; see Altx I, 167 F. Supp. 2d at 1372-73 (detailing the seven bases for the Commission's negative threat determination).

The Domestic Producers continue to challenge the ITC's threat determination, claiming that the negative threat finding should be remanded due to the Commission's reliance on "its unsupported volume, price and impact analyses."  Pls.' Objections at 39.  As discussed above, however, the ITC has reconsidered and reaffirmed its findings on the volume, price effects, and impact of the subject imports, and the court has upheld the Second Remand Determination in all respects as the court finds it supported by substantial record evidence.  As a result, there is now sufficient support for the Commission's negative threat determination as well.

---

[17] The court notes that it sustained two of the ITC's proffered reasons for its negative threat determination in Altx I.  See 167 F. Supp. 2d at 1372-73.

**CONCLUSION**

In light of the foregoing, the court sustains the Commission's Second Remand Determination.  The Commission complied with the court's instructions in Altx I to "address significant arguments and evidence which seriously undermines its reasoning and conclusions." 167 F. Supp. 2d at 1374.  Taken as a whole, the court now finds that the ITC decision is substantially supported and explained.

_____
Jane A. Restani
JUDGE

Dated: New York, New York

This 31st day of December, 2002.